## McGLOTHAN v. PENNSYLVANIA R. CO.
### No. 9594.

United States Court of Appeals
Third Circuit.

Argued June 8, 1948.

Decided Sept. 14, 1948.

Owen B. Rhoads, of Philadelphia Pa. (H. Francis De Lone and Barnes, Dechert, Price, Smith & Clark, all of Philadelphia, Pa., on the brief), for appellant.

Donald J. Farage, of Philadelphia, Pa. (B. Nathaniel Richter, and Richter, Lord & Farage, all of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This action to recover damages for the death of Edna Hawkins was brought by her representative under the provisions of

the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. A verdict was returned in the amount of $10,000, but the court below granted to the defendant a partial new trial on an issue not pertinent here, and at the same time rejected its arguments for a full new trial or, in the alternative, for judgment in accordance with its motion for directed verdict. 72 F.Supp. 176. This appeal followed the disposition, contrary to the interest of the defendant, of the partial new trial. 74 F. Supp. 808.

The defendant asserts that it is entitled to a retrial of the case because the court below erred in (1) instructing the jury on the evidence with respect to the existence of a reasonably safe footway, and denying the defendant's request for charge on that issue; (2) excluding evidence relating to the marital status of decedent and her husband; and (3) allowing interest from the date of the judgment entered upon the verdict, rather than from the date of the order following the disposition of the partial new trial.[1]

The issue first raised by the defendant does not encompass the full scope of its alleged liability for negligence, but rather one phase of the case against it. Accordingly, the necessary statement of the evidence is considerably narrowed.

Edna Hawkins suffered her fatal injuries on December 27, 1944, while in the defendant's employ as a switch oiler on its tracks in the immediate vicinity of the Girard Avenue-Forty-Fourth Street Bridge, in Philadelphia. Eight tracks, running in an east-west direction, pass under this bridge, some being separated by the concrete bridge supports or abutments, as they were referred to in the court below. A plan, introduced in evidence, assigns names to these tracks, which, for convenience, will be used here, and discloses their relation to each other and to the abutments. Reading from north to south, the plan is as follows: "Jersey," abutment, "Westward," "Eastward," abutment "Cut," "Departure," abutment, "No. 2 Freight," abutment, "Outward Passenger," and "Inward Passenger."

A few minutes prior to the accident the decedent was given instructions, at a point east of the east side of the bridge, to oil the "No. 28 switch." That meant that she was to oil a switch on the "Eastward" track about ten feet east of the east side of the bridge, and another switch on the same track about ten feet west of the west side of the bridge. It is thus obvious that at some time she had to pass under the bridge, there being no evidence of any other means of getting from one side to the other. Although there was no direct evidence that the decedent was trying to get from one side of the bridge to the other,[2] the fact is that she was crushed to death just within the east side of the bridge between an engine moving west[3] on the "Eastward" track and the abutment to the south of it.

It is conceded, as it must be, that there is no sufficient clearance for a person to stand or walk under the bridge between an engine on the "Eastward" track and the abutment to the south of it. There was evidence, adduced by the defendant, however, of clearances north of the "Westward" track, between the "Departure" track and the abutment to the south of it, and between the "No. 2 Freight" track and the abutment to the north of it. The defendant's evidence also disclosed that the decedent had no duties that would take her

---

[1] The verdict was returned on November 20, 1946, and judgment entered that day. The partial new trial was granted on June 4, 1947, to determine the capacity of the "representative" to sue, and was disposed of, without jury, on December 18, 1947, 74 F.Supp. 808. The order thereon, entered January 7, 1948, directed that judgment for the plaintiff be entered in the amount of $10,000.00 with costs, and interest from November 20, 1946.

[2] Shortly after the accident, the decedent's "tools," a broom and a pail, were found on the west side of the bridge. Apparently she had left them there while she walked to the east side for her instructions. At least such an inference is permissible, there being no evidence that her "tools" had been moved.

[3] The engine was facing east, but moving backwards. The names of the tracks are for reference only and, according to one witness, these tracks carried traffic in both directions.

to the "No. 2 Freight" track or those to the south of it, the "Outward Passenger" and the "Inward Passenger." These latter three tracks, according to the testimony, are high speed "main" lines, whereas the others in the group are "yard" tracks on which traffic operated at a reduced speed not exceeding 15 M.P.H. Moreover, one of the defendant's witnesses stated that the designated pathway under the bridge was south of the "Departure" track, and that decedent might have been subject to discipline if she were found along the "main" lines. Another of the defendant's witnesses, however, testified that he had given the decedent her instructions when she first took over the job of switch oiler, and his testimony affords the inference that he had instructed her to use a clearance north of the "Westbound" tracks.

With this evidential background, the defendant requested a charge to the jury as follows:

"In considering the question of negligence on the part of the defendant you may take into consideration the evidence that the decedent had no duties to perform under the bridge; that her duties were to be performed at points either east or west of the bridge and beyond the abutments and that the defendant furnished her a reasonably safe passageway from one point to the other."

This request was refused, but in the course of his instructions to the jury, the learned trial judge said:

"The testimony, as I recollect it, was that Mrs. Hawkins, or Mrs. Smith, as she was known by the railroad company, was to perform her services on tracks *which were beyond the tracks over which there has been some evidence offered that she could have crossed* and then went through and under the bridge by what they called a sort of footway, as it were, a clearance. But you must bear in mind that the evidence discloses that *her work was on the tracks in the opposite direction, and the tracks that she must cross in order to get to this clearance, to go under the bridge, were tracks over which were operated*

*trains at a high rate of speed.* It will be for you to determine whether under those circumstances she should cross those tracks to get to that footpath or clearance and go under the bridge, or whether it was the reasonably safe thing for her to go through the bridge *where the yard trains were operated at a reduced speed."* (Emphasis defendant's).

We do not think it was error to deny the quoted request for charge. Plainly, the decedent had a duty to be under the bridge at some time. Considering the position of the switches on which she was to work, it is plain, too, that she would have had to cross tracks to reach a "reasonably safe" pathway, if there was one, or follow the "Eastward" track, along which she met her misfortune. It was for the jury to measure the risks involved, and to determine the extent, if any, to which the decedent was contributorily negligent, since the statute under which the action is brought provides for recovery where the defendant is wholly or partially at fault. 45 U.S.C.A. § 51. Whether there was a reasonably safe footway depended, among other things, on the position of the decedent with respect to the pathways, the scope of her work and the area in which she was permitted to operate, her previous experience,[4] and the instructions given to her.

Nevertheless, it is patent that the charge as rendered was erroneous, for the evidence was undeniably misstated. The learned trial judge did not consider the error to have been prejudicial, 72 F.Supp., at page 181, and concluded that, "in any event, a new trial is not merited." We are thus to determine whether the misstatements in the charge substantially prejudiced the defendant's case.

Although the jury was forewarned that it was the sole judge of the facts, and that its recollection of the evidence was controlling, nonetheless it would not readily conclude that the court erred. Especially is this true where, despite the previous allocation to the jury of its particular function, the court, at the time the error was

---

[4] Decedent held the position as switch oiler for two weeks prior to the accident.

called to its attention, insisted upon the correctness of its statement, instead of referring the doubt to the conceded trier of the facts.[5]

■ In our opinion, the statement of the testimony by the trial court could serve only to confuse the jury on a prime factual issue. And at the same time, the statement fails to comply with the elemental principle that it ought not to be one-sided. As held in Sperber v. Connecticut Mut. Life Ins. Co., 8 Cir., 1944, 140 F.2d 2, 5, certiorari denied, 321 U.S. 798, 64 S.Ct. 939, 88 L.Ed. 1087:

"The problem here is not that of a judge commenting upon or stating an opinion about the evidence. The situation is that the Court in summarizing an important aspect of the evidence * * * outlined the evidence favoring appellees and, when requested to cover the same aspect where favorable to appellant, omitted to do so.

"While a federal trial court is not at all required to state his recollection of the evidence with nice exactitude for both sides, yet, if such summary is made, it must be fair to both sides to the extent that it is not so one-sided or so warped that it must be regarded as prejudicial to one side in its effect upon the jury."

The case at bar is thus immediately distinguished from Zurich v. Wehr, 3 Cir., 1947, 163 F.2d 791, 793.

We think our summary of the evidence indicates with sufficient clarity the shortcomings of the statement quoted. That statement narrowed the several possibilities suggested by the evidence in defendant's favor for the decedent's safe passage under the bridge. The question left to the jury, whether the decedent should have crossed the high speed lines, or risked the inadequate passage along the "Eastward"

track, where she met her death, forbode an inevitable answer that the defendant had failed to furnish her a "reasonably safe" transitway through the bridge tunnels.

Not only was the jury misinformed as to the tracks which the decedent would have to cross, but also as to the nature of the traffic she could expect to encounter on those tracks. In this wise, too, the court, albeit unintentionally, eliminated the possible safe passage suggested by the evidence along the south of the "Departure" track, or, at least, confused it with the passage along the north of the "No. 2 Freight" track. The statement that the decedent had "no duties on those tracks" further added to the confusion, for it would be as well applicable whether the tracks were high speed or not.

■ The importance of the issue is certainly to be considered in assessing the prejudicial effect of trial error. Here, the issue is one which alone could support the jury's decision that the defendant was guilty of negligence which contributed to the death of Edna Hawkins. Coupling the statement in the charge with the further statement of the Court at the time of the defendant's objection thereto, it is clear that the jury was left with a mistaken and misleading impression of the evidence in the case, and as well with respect to its force and direction. We are of the opinion, therefore, that the error was prejudicial to the defendant and that a new trial must be ordered.

The defendant's second point complains, as already noted, of the rejection by the trial judge of evidence relating to the marital status of the decedent and her husband, Benjamin Hawkins. By this evidence the defendant sought both to attack Hawkins' credibility on cross-examination, and, as part of its own case, to

---

[5] "Mr. Rhoads: Then, if Your Honor please, I would like to take exception to that portion of the charge where you were referring to her work being distant from the safe passageway and saying that there was evidence of trains passing on the departure and cutting tracks, which are the two tracks at high speed. If Your Honor please, the evidence, I believe, was that her duties included those tracks and the east and west bound—

"The Court: No, sir, it was very clear in my mind about that.

"Mr. Rhoads: There was ample clearance on the east and west bound tracks, also.

"The Court: The evidence is quite clear, Mr. Rhoads, that she had no duties on those tracks."

affect the damages for the decedent's death. Independent of the purpose of the evidence, we have also a question, whether certain Veterans' Administration ("VA") records pertaining to Hawkins were available to the defendant in view of a statute characterizing such records as "confidential and privileged."

The decedent's husband was the only one of her surviving relatives as to whom evidence of pecuniary loss was adduced.[6]

It was the aim of the plaintiff to show that Hawkins, by reason of disabilities sustained by him while in the armed service in time of war, would be dependent upon the decedent for support. As part of his case, following the evidence relating to the accident, plaintiff put on the stand a representative of the VA who had with him, in accordance with the demands of a subpoena caused to be issued by the plaintiff, Hawkins' VA file. From this file, evidence was adduced relating to Hawkins' physical condition. When plaintiff put Hawkins on the stand, he testified on direct examination, in effect that he and the decedent were on good terms. The defendant was permitted to cross-examine Hawkins on this issue on the basis of the statements made by him in the "Induction Report" which was part of his VA file.[7] According to this document, Hawkins had reported on May 29, 1942, that he was separated from his wife and that her specific address in Philadelphia was unknown to him. It also disclosed that Hawkins had named his mother as the nearest relative to be notified in case of emergency, had made her his beneficiary for allotment purposes, and his sister as alternate beneficiary. The plaintiff's objection to this line of examination as irrelevant, and not affecting the decedent's legal obligation to contribute to Hawkins' support, was overruled on the specific ground that it was an attack upon Hawkins' credibility.

For the sole purpose of mitigating damages, the defendant sought to include the Induction Report as part of its own case. This, too, was permitted. Later, the defendant sought to adduce additional evidence[8] respecting the marital status, but by then the trial judge had concluded that it was irrelevant and rejected it. In the course of his charge, the trial court ruled that the the jury could not consider the

---

[6] The complaint stated that the death of Edna Hawkins resulted in damage to "her husband, Benjamin Hawkins, and a number of brothers and sisters."

[7] His testimony was that the decedent gave him a "going away" party on May 28, 1942, the day before he entered the Army; that they corresponded regularly until the decedent died; and that by correspondence they had planned to buy a home when he came out of the service. He stated that he knew her address, and on cross-examination admitted that they had had a falling out sometime in 1938, but that a reconciliation had taken place. He could not account for the statements in his induction paper that her address was unknown and that they were separated at the time the paper was signed by him, on May 29, 1942. He accounted for the fact that he had made his mother eligible for his allotment by stating that he and his wife agreed that since she was working she would not need it.

[8] The offers were as follows: (1) Application signed by "Edna Louise Smith" for participation in the defendant's relief fund making her sister beneficiary, bearing the statement "Benjamin (Separated)", and dated January 5, 1943; (2) defendant's check pursuant to that application to the order of her sister, dated February 8, 1945; (3) withholding exemption certificate dated June 9, 1943, signed by "Edna L. Smith" on which was checked the statement "Single person (not head of a family) or married person not living with husband or wife (not head of a family)"; (4) a card from defendant's files showing that the decedent was carried on defendant's records under the name of "Smith, Edna Louise (Mrs.)"; (5) two papers acknowledging receipt of copies of safety rules dated January 5, 1943, and May 5, 1943, signed "Edna L. Smith" and "Edna Louise Smith" respectively; (6) a form known to the defendant as "CER-1" dated January 5, 1943, signed "Mrs. Edna Louise Smith"; and (7) testimony of a witness that the decedent was known to the defendant and was carried on its records as Smith, rather than Hawkins.

It may be noted that in the part of the case relating to the manner in which the decedent sustained her injuries, there was evidence that she was known to her fellow employees by the name of Smith.

issue of the marital status or the VA records in connection therewith.[9]

The views of the learned trial judge on this issue are fully stated in his opinion disposing of the defendant's motions. It is sufficient to state here, by way of summary, that the evidence with which we are now concerned was excluded because (1) there was no issue of past non-support, since Hawkins' need for support did not arise until after decedent's death; (2) the evidence was merely indicative of a lack of interest on the part of decedent toward Hawkins, and whether that feeling would continue in view of Hawkins' need was too speculative to have any bearing on the issue of probable non-support; and (3) the evidence fell short of destroying the marital duty of the decedent and could not be admitted as indicating a probable termination of the relation or duty in the future. It was also concluded that the evidence was inadmissible on the issue of Hawkins' credibility since it was collateral and not useful for any purpose independent of the contradiction. These arguments are adopted in toto by the plaintiff, and in addition, it is urged, presumably to bring the case within the decision of this Court in Dow v. Carnegie-Illinois Steel Corp., 3 Cir., 1948, 165 F.2d 777, that the evidence was too remote.

We are at once brought into a phase of the law explored in Dow v. Carnegie-Illinois Steel Corp., supra. Parenthetically, it may be noted that the learned trial judge could not have had this decision before him at the time he made the rulings complained of. The actual holding of the Dow case, however, does not encompass the problem of the case at bar; in that case there had been a reconciliation, and the fact that divorce action had been instituted and terminated years before the reconciliation did not permit an inference of such a "disposition on the part of the husband to withhold funds which he might otherwise have given his wife if he had lived." But as we stated in the Dow case:

"An examination of the authorities demonstrates that there are no clear signs as to what evidence respecting marital happiness or unhappiness may or may not be admissible. * * * Under almost all other conceivable circumstances, however, recovery has been allowed by some courts though aggravated conditions or causes of separation between husband and wife have served to mitigate damages. While it may be doubted that the human mind, whether empaneled in a jury box or not, can cast up with any degree of accuracy degrees of domestic bliss or marital unhappiness in terms of money, this is the course upon which our law, whether federal or State, has projected itself, and we may not now turn it into a new and perhaps more profitable direction." 165 F.2d at page 780.

It is a singular feature of the instant case that the absence of past support from the decedent to Hawkins could carry no weight because the obligation to support is reversed and the facts effectuating the decedent's alleged obligation did not begin to operate until after the husband had been discharged from the Army. By that time, of course, the decedent had met her death.

■ We think, nevertheless, that evidence of an existing separation, or evidence of a separation commencing prior to the decedent's death and affording a reasonable inference of continuing to that point, is under the circumstances both relevant and material in mitigation of damages. Cf. Fogarty v. Northern Pac. R. Co., 1915, 85 Wash. 90, 147 P. 652, L.R.A.1916C, 803; Gilliam v. Southern R. Co., 1917, 108 S.C. 195, 93 S.E. 865. Such evidence, it is true, would not be adequate to deprive the husband of all benefits under the Act. Southern Ry. Co. v. Miller, 4 Cir., 1920, 267 F. 376, 381. Nor would it be sufficient to justify an inference that the decedent was not obligated, under the laws of

---

[9] The instruction was:

"You will recall the induction record that was produced here by the Veterans Bureau. The record was passed among yourselves and I observed that you read it very carefully. On that record there was allegedly a reply to a question asked to the effect of 'Are you married?' and 'Are you living with your wife?' and the answer was 'Separated'. You will totally disregard that from this case. That question does not exist here. It is not properly in the case."

Pennsylvania,[10] to contribute to her husband's support, or the inference that that obligation would soon come to an end. But the question for the jury was how much would the decedent have contributed to her disabled husband. To that end, the jury was instructed to determine "the amount that she (decedent) would give or contribute toward the maintenance of Mr. Hawkins" after considering "her earning power, which would be that, the length of time she would live, the regularity of her employment, the amount in this case that would be required to maintain herself." That the evidence would not affect the *reasonableness* of Hawkins' *expectancy* of support, in view of the local law, is not decisive. For at least it had a bearing on the jury's determination of the amount which the decedent might be expected to contribute over and above any amount which she might be compelled to furnish by virtue of the operation of the local law. The case of Dunbar v. Charleston & W. C. R. Co., C.C.Ga.1911, 186 F. 175, upon which the plaintiff puts some reliance, is distinguishable for the dual reason that the court assumed that the separation was merely temporary, and the holding of the case was merely that the separation did not affect the right to recover damages. The defendant does not contend here that the separation, if it existed, should operate to cut off the right to damages, but only that the evidence was worthy of consideration in mitigation of damages.

■ We conclude, accordingly, that rejection of the evidence relating to the marital status of the decedent and her husband was erroneous, and also that, in removing from the jury's consideration an element affecting damages, the error was prejudicial.

■ It follows, too, that since the evidence was relevant, and since Hawkins had testified on direct examination on the issue of his marital status, the defendant was entitled to cross-examine him on that score and to test his credibility. But the plaintiff asserts that in so doing the defendant was not entitled to use portions of Hawkins' VA file other than that which the plaintiff himself had used. In fact, as already noted, the defendant used Hawkins' Induction Report both to attack Hawkins' credibility and as part of its own case in mitigation of damages.

The statute and VA Regulations upon which the plaintiff bases his claim of privilege are set out in the margin.[11] The first attempt of the defendant to use the

---

[10] 62 P.S. § 1973. See also Commonwealth ex rel. Killmaier v. Hermann, 1930, 99 Pa.Super. 135; Department of Public Assistance v. Heinbaugh, 1942, 45 Pa.Dist. & Co. 38; Department of Public Assistance v. Palmer, 1942, 45 Pa. Dist. & Co. 590.

[11] June 7, 1924, c. 320, § 30, 43 Stat. 615, as amended, 38 U.S.C.A. § 456, which, insofar as here pertinent, reads:

"All files, records, reports, and other papers and documents pertaining to any claim for the benefits of the provisions of this chapter, whether pending or adjudicated, shall be deemed confidential and privileged and no disclosure thereof shall be made except as follows:

"(a) To a claimant or his duly authorized representative, as to matters concerning himself alone, when in the judgment of the Administrator of Veterans' Affairs such disclosure would not be injurious to the physical or mental health of the claimant;

"(b) Where required by the process of a United States Court to be produced in any suit or proceeding therein pending; or when such production is deemed by

the Administrator of Veterans' Affairs to be necessary in any suit or proceeding brought under the provisions of this chapter; * * *".

The Regulations of the VA, 38 C.F.R., Part 1, insofar as here pertinent read:

"§ 1.315. Judicial Proceedings Generally.

"(b) Where the process of a United States court requires the production of documents or records (or copies thereof) contained in the Veterans' Administration file of a claimant, such documents or records (or copies) will be produced in the court out of which process has issued. Where original records are produced they must remain at all times in the custody of a representative of the Veterans' Administration and if offered or received in evidence permission should be obtained to substitute a copy so that the original may remain intact in the file. Where the subpoena is issued on praecipe of a party litigant other than the United States such party litigant must prepay the cost of copies in accordance with fees prescribed by § 1.328 and any other costs incident to production."

Induction Report was in cross-examination of the VA representative. At that time, the plaintiff's objection, that it was beyond the scope of the direct examination, was sustained. As stated, the defendant again sought to use the Induction Report in its cross-examination of Hawkins. The plaintiff's objection, that the information was irrelevant, was overruled; Hawkins identified the Report and his signature, the Report was marked as an Exhibit, and the information therein was made known to the jury through the cross-examination. Thereafter, the defendant made the VA representative its own witness, as part of its case, and limited questions to identification of the Report. During this brief direct examination, the VA representative stated that if it was necessary that the document "be submitted as identification," he was not permitted to release it from the folder. This statement apparently was in obedience to the Regulation, § 1.315(b), that "Where original records are produced they must remain at all times in the custody of a representative of the Veterans' Administration * * *." The direct examination ended, the plaintiff stated that he did not wish to cross-examine. It was then that the Court asked the VA representative whether the "paper" was confidential, and how it came to be released. Stating that it was confidential, the representative added, "These reports, it was merely released for inspection here. The folder of Mr. Hawkins was subpoenaed into Court, so that both counsel would be permitted to examine anything in the folder. For instance, your Honor, where a man has made application for a pension and we do not have his records, we send to Washington for his records and then after those records come back we rate him, and all of those folders are placed and kept very securely in an envelope by itself and they remain part of the records for the rest of his life." Following this answer, the Court suggested to the defendant that the document be permitted to remain in the file, and agreed to allow the defendant to read the pertinent portions to the jury "with the same force and effect as though the exhibit were attached to the record." Before the reading began, however, the plaintiff, for the first time in the case, objected on the ground that "it is a confidential communication, and by statute of the United States it is not admissible except of pro tanto as it is released." The objection was overruled, and after the reading to the jury, the document was submitted to it for inspection.

The records and files of the various governmental departments and agencies are frequently the subject of statutes and regulations enshrouding them with the cloak of confidence and privilege.[12] Such statutes, as might be expected, differ widely, as do the Regulations.[13] Whether the instant statute accords a privilege in the records to the individual concerned as well as to the government does not expressly appear. Cf. Harris v. Walsh, 1922, 51 App.D.C. 167, 277 F. 569; Federal Life Ins. Co. v. Holod, D.C.M.D.Pa.1940, 30 F. Supp. 713. The legislative history does suggest, however, that some consideration for the desire of the individual was entertained.[14] But that suggestion leaves in doubt whether it was merely the aim of

---

[12] See 8 Wigmore on Evidence (3rd ed. 1940) §§ 2377–2379, and notes thereto. See also, Boske v. Comingore, 1900, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (distillery reports to collector of internal revenue); Harris v. Walsh, 1922, 51 App.D.C. 167, 277 F. 569, and Federal Life Ins. Co. v. Holod, D.C.M.D.Pa.1940, 30 F.Supp. 713 (Selective Service records); Ex parte Sackett, 9 Cir., 1935, 74 F.2d 922 (Department of Justice records); In re Grove, 3 Cir., 1910, 180 F. 62, and Firth Sterling Steel Co. v. Bethlehem Steel Co., D.C.E.D.Pa.1912, 199 F. 353, and United States v. Haugen, D.C.Wash.1944, 58 F.Supp. 436 (Mili-

tary secrets); Crosby v. Pacific S. S. Lines, 9 Cir., 1943, 133 F.2d 470 (foreign government communications); and United States v. Beekman, 2 Cir., 1946, 155 F.2d 580 (O.P.A. files). Of these, all except the Haugen and Beekman cases involved private litigation in which the governmental department or agency was not a party.

[13] See 8 Wigmore on Evidence, op. cit. supra, §§ 2377–2378a, and notes thereto.

[14] Congressional Record, 68th Cong. 1st Sess. (1924), p. 11011: Mr. Johnson: "We have made the files of the Veterans' Bureau confidential. Some members of the House might think they

the legislators to make confidential the files held by the governmental agency because they concerned "a chapter of some man's life history," granting a license to the claimant to authorize release of such information, or whether the object was to create a privilege running to the veteran as protection for communications made to the government which might otherwise have been withheld.[15]

■ Such an inquiry is unnecessary here, for by express provision of the applicable statute the VA files are shorn of their "confidential and privileged" overdress when those records are "required by process of a United States court to be produced in *any suit or proceeding therein pending.*" (Emphasis supplied.) Insofar as there exists a governmental policy of secrecy, therefore, it has been waived to that extent. And it would appear that, in accordance with its Regulations, the VA had expressly exercised its discretion to release the records of Hawkins, the VA representative declaring, "The folder of Mr. Hawkins was subpoenaed into Court, so that both counsel would be permitted to examine anything in the folder." We cannot assume that these records were not properly produced by the VA. Cf. Flannery v. Flannery Bolt Co., 3 Cir., 1939, 108 F.2d 531, 534, 535.

■ It is patent, from the recitation of the circumstances, that plaintiff's objection was designed to take exception to the VA records on whatever privilege he could claim. But the plaintiff, who was in point of fact acting for Hawkins, subpoenaed the file. Aside from the doubt that the privilege running to Hawkins was thus destroyed, it is significant that the objection to the Induction Report on the ground of privilege was not raised at the time the defendant used the Report to cross-examine Hawkins. And the Report was then so used that in truth, if not formally, it was in evidence, the information contained therein having been made available to the jury. Again, the plaintiff permitted the defendant to establish the identity of the Report. It was not until the VA representative stated that he was not permitted to physically relinquish the document, and the court ascertained the basis of this refusal, that the plaintiff first raised the issue of confidence and privilege. Under the particular facts, we believe that whatever privilege Hawkins had to keep the file out of the case was waived by him. The assertion of such a privilege must be timely to be effective. In so holding, we add that the court below did not exclude the Induction Report from the case on any ground of privilege, but rather because the information sought to be included in the record was irrelevant. We add, too, out of an abundance of caution, that we do not here hold that the VA files pertaining to veterans may be summarily brought out into the open in any private litigation. The answer, we think, depends upon the particular facts of the case, and upon the ruling of the VA as well.

---

would not have authority to go into those files; but if there is any patient of the Veterans' Bureau who desires any Member of the House or Senate or anyone else to go into his case for him, all he has to do is to write a letter conferring that authority."

Mr. Johnson: "I think it (permission to examine) would be refused, and I think it ought to be refused, unless he can show that he represents the claimant. In other words, you have there the military records of thousands of men. Each military record contains a chapter of some man's life history.

"It contains the medical testimony that touches his life during the war and those records should not be open to inspection to everyone."

"This provision was inserted only to prevent unauthorized persons from the inspection of records."

Mr. Chindbloom: "Will not the gentleman concur in the opinion that a letter from an ex-serviceman, or from a member of his family, addressed to a Member of Congress, ought to be considered as authority, even under the provisions proposed?"

Mr. Johnson: "Unless that letter was written by a member of his family for the purpose of interfering in some civil suit; then I would say no."

Mr. Chindbloom: "Certainly. The gentlemen's modification is absolutely correct."

[15] Cf. 26 U.S.C.A. § 55(a) (2), relating to income tax returns. See 8 Wigmore on Evidence, op. cit. supra, §§ 2374 and 2377.

On the view we have taken, it becomes unnecessary to consider the defendant's final point relating to interest on the judgment. Accordingly, for the reasons stated, the judgment will be reversed and the cause remanded for further proceedings not inconsistent herewith.