Julius WELLS

v.

READING COMPANY.

Civ. A. No. 14219.

United States District Court
E. D. Pennsylvania.

Jan. 26, 1956.

Alan Kahn, of Richter, Lord & Farage, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., Henry R. Heebner, of Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case comes before the court on plaintiff's motion for new trial after entry of judgment for the plaintiff in the amount of $2,500 on the special verdict of the jury.[1]

The testimony offered during the four-day trial of this suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., among other things, disclosed the following:

A. Plaintiff was the fireman-helper on a large, double-unit, diesel, railroad engine (approximately 109 feet long)

1. The special verdict of the jury was as follows:

"1. Was the defendant, Reading Company, its employees or agents (other than Julius Wells), negligent and did this negligence contribute, in whole or in part, to the injuries?

Yes or No     Yes

"If your answer to this question is 'no,' do not answer the questions listed below. If your answer to this question is 'yes,' answer the questions listed below.

"2. What were the damages suffered by Julius Wells?  $5,000.00

"($138.74 for doctors' bills and loss of earnings, plus damages for pain, suffering, injury and inconvenience)

"3. Was the plaintiff, Julius Wells, negligent and did this negligence contribute to the injuries?

Yes or No     Yes

"If the answer to this question is 'no,' do not answer question No. 4.

"4. If your answer to question 3 is 'yes,' what proportion of the negligence was attributable to the plaintiff, Julius Wells?  50%

used on defendant's fast passenger train, "The Crusader." This engine, to which no cars had yet been attached, was being moved backwards[2] on the "hill track" about 12:30 P.M. on August 13, 1952, from a fueling and servicing area at 9th and Green Streets, in an easterly direction, preparatory to its being taken westward by a cross-over track onto a main westward track leading into the Reading Terminal (see Exhibit P-1. The engine was required to move backwards far enough east on the hill track so that the engineer located in the cab at the western end of the train could see a dwarf signal (marked "2" on Exhibit P-1) located to the north of that track and facing east, which signal indicated the position of the switch leading to the cross-over track. The distance between this signal and the bumper block at the east end of the hill track was approximately 370 feet (see diagram marked Exhibit P-1).

B. At the time plaintiff's engine was being moved eastward on and along the hill track, there was another double engine (approximately 112 feet long) which was standing on that track with its west end about 150 feet from the above-mentioned dwarf signal. As plaintiff's engine was about to come to a stop, it collided[3] with this standing, double engine (hereinafter called "400 type engine") causing the injuries for which the suit was brought. The east end of this 400 type engine was approximately 109 feet from the bumper block at the east end of the hill track.

C. As was customary in this move eastward and along the hill track, plaintiff was stationed in the east end of his double engine so that he could watch for another dwarf signal (labeled "1" on Exhibit P-1) south of the hill track and west of the above-mentioned dwarf signal and so that, in case of emergency, he could warn the engineer by a warning bell or stop the train by emergency brake which was available to him in his position in the cab at the east end and south side of the train. Plaintiff testified that he left his position at the east end of this engine when it slowed down and the east end of this engine had reached a certain point in relation to a mark on the fence north of the hill track, at which point, he knew from experience, the west end of the engine was about 6 or 8 feet east of the dwarf signal. Plaintiff testified this was where his engineer (Mr. O'Grady) stopped every day so that, when he reached this point[4] and was still moving, he started to go back, sliding sideways through a narrow passageway in the engine, to the west end of the engine, where he was required to be stationed on the move west to the Reading Terminal. Plaintiff and two other engineers called by plaintiff indicated that the practice of defendant's engineers was not to move the west end of their engines more than 5 feet east of the dwarf signal in making this move.[5]

D. Mr. O'Grady,[6] the engineer on plaintiff's engine, was stationed in the cab on the west end and north side of

---

2. The phrase "moving backwards" is used because the engineer was stationed during this move in the cab at the end of the engine opposite to the direction in which the engine was moving, although there was a cab at each end of the engine and it could apparently be operated equally well from the cab in which plaintiff was riding during most of the move prior to the collision.

3. The collision was no harder than the average yard coupling.

4. Plaintiff testified the 400 type engine was then 40 or 50 feet away.

5. The engineers testified that they were 12 or 15 feet from this signal when in the cab and their position in the cab was about 9 feet from the west end of the engine.

6. Michael M. O'Grady had been engineer on defendant's crack passenger train, "The Crusader," ever since her maiden trip in the 1930s. He has been an engineer since 1916. Mr. Wells had been fireman with him for less than a year but he had worked for the defendant for about 30 years.

this double engine. He was approximately 100 feet west of plaintiff's position at the east end of the engine. Since Mr. O'Grady is a large man (6' 1" tall and weighing 220 lbs.), his ability to lean out the window of his cab in order to look toward the east during the backing of the engine was limited. See photograph marked Exhibit D-6 (also N.T. 292–295), showing the approximate view which would be seen by the engineer looking out of his window to the rear (east) taken from the same engine within 10 feet of the position of that engine when the collision occurred. The engineer did not have a full view [7] to the rear comparable to the view available to plaintiff (N.T. 327; compare view in Exhibit D-6 with view in Exhibit D-1). He testified that he could not see something on the track to the rear of the engine, unless it was 400 or 500 feet away from him.

Mr. O'Grady testified that he thought the engines were back near the bumper block (within 10 feet of that block)[8] and he had plenty of room to continue backing (N.T. 317) as he allowed the west end of his engine to "drift" eastward, with power off, past the dwarf signal at two miles per hour an extra half revolution of the engine's crankshaft in order to make sure there was no "knock" in the engine (N.T. 320).

Plaintiff had also testified that the 400 type engine was "right close to the block"[9] when first asked about its location (N.T. 53–55). As a result of further cross-examination, he testified later that he could not tell how far this engine was from the block but that it was "close to the block" (N.T. 65).[10] On the redirect examination, he testified that he did not know how far the east end of this engine was from the block.[11]

7. See photograph marked Exhibit D–9 and N. T. 298–299 and 322–325 to show position Mr. O'Grady assumed when looking to the rear. The window of the cab is approximately 24 inches by 24 inches (N. T. 123) and plaintiff's expert witness who was an engineer testified that a big man would have more difficulty in operating the engine to the rear with his head out the window (N. T. 117). Mr. O'Grady testified positively that when the engine was backing, plaintiff had no right to leave his position, with a clear view to the rear, before the engine had stopped (N. T. 327).

8. He thought the west end of the standing engine was 300 feet from the dwarf signal (N. T. 333).

9. By this expression, he testified he meant less than 10 feet (N. T. 55).

10. Plaintiff also testified that the west end of this engine was "quite a way back" from the number 3 switch which was the approximate location of that end of the engine according to the testimony of Mr. Moulder (fireman of the 400 type engine), who was the only person standing on the ground beside this engine immediately before the time of the collision.

11. The redirect examination by counsel for plaintiff (N. T. 97–98) included the following:

"Q. Now, are you able to tell us, Mr. Wells, with any kind of accuracy, whether the east end of the locomotives with which your engines collided were ten feet or one hundred and ten feet from that block? Can you give us that information with any kind of accuracy? Do you know what I mean? A. Will you—

"The Court: Just repeat the question, Mr. Blumberg.

(The question was repeated by the reporter.)

"The Witness: Wait a minute.

"The Court: If you don't know, just say you don't know.

"The Witness: No, I just—"

"By Mr. Kahn:

"Q. Do you understand my question?

"The Court: Do you understand the question?

"The Witness: How far they were away—well, they were—"

"By Mr. Kahn:

"Q. I am speaking about the east end of those two 400 class locomotives—I am asking with regard to the distance of that east end of those locomotives to the block at the end of the outbound track or hill track. A. Oh, I don't know—no, I don't know how far.

"Q. You say you thought—I believe you testified on cross-examination it might have been about 10 feet, and you were asked whether it could be 110 feet. Now, are you able to tell us with any

With this testimony in the record, counsel gave closing speeches to the jury which discussed much of the evidence as part of their arguments. Counsel for plaintiff emphasized in his closing speech that the liability of the defendant was due to the fault of Mr. O'Grady, the engineer.[12] As part of this emphasis he read to the jury portions of the transcribed testimony of Mr. O'Grady (N.T. 388). Also, plaintiff's counsel argued that, since Mr. O'Grady testified that he thought the 400 type engine was close to the bumper block but could not be sure of this, he should have been "doubly careful" (N.T. 381). Neither counsel pointed out in their closing speeches that plaintiff himself had testified that he thought these engines were "right close" to the bumper block but plaintiff's counsel stated to the jury, in relation to plaintiff's testimony as to the distance of the 400 type engine from this block, that plaintiff was asked "a great many involved and complicated questions" so that he "finally was driven to the point where he said the only truthful thing he could say, 'I don't know'" (N.T. 408).

In order to make sure that the jury, in arriving at a just and true verdict, considered what the trial judge believed to be very relevant testimony (given on the morning of the first day of the four-day trial[13] and not mentioned in the closing statements of counsel) concerning the reasonableness or unreasonableness of Mr. O'Grady's action in allowing the west end of his engine to drift more than forty feet past the dwarf signal in order to listen for a knock in his engine, the charge included the following language (N.T. 425–428):

"Again I advise you that it is your memory of the facts which controls, but my memory of the facts as testified to is that if the 900 type double engine which Mr. O'Grady was driving had stopped within approximately 41 feet of the No. 2 dwarf signal, there would have been no collision. You will have to decide whether Mr. O'Grady failed to act as a reasonable man, properly considerate of the safety of others, would do in not stopping his locomotive within that distance under all the circumstances of this case.

"One of the circumstances is the question whether Mr. O'Grady was reasonable in his thought that the standing engines were back near the bumper block. If this was a reasonable belief for a person with the view eastward; that is, the direction in which the engine was going, that Mr. O'Grady had, there was apparently plenty of space to allow his engine to drift that extra half revolution at two miles per hour.

"Now, *one factor in determining whether this was a reasonable belief for Mr. O'Grady* is the very positive testimony of Julius Wells, the plaintiff, that the engines were, and I am quoting the words of Mr. Wells, 'right close to the bumper block.' Mr. Wells gave this positive testimony the first time he was asked about the matter on cross-examination, at pages 53 and 54 of the typewritten notes of testimony.

"Since Mr. Wells' testimony covers more than 100 pages of these notes of testimony, it would be reasonable for you to find that this testimony which he gave near the beginning of his cross-examination

---

kind of accuracy at all? A. No, I couldn't. I don't know."

12. N. T. 384–390 and 414–416. At page 385, the language of plaintiff's counsel is:

"Mr. O'Grady is a man who though not a party in the case, he is a man who is at fault if the railroad is at fault at all. He is the one who is responsible. Now, while he doesn't have any

direct interest in the case, I think you all recognize that human nature is such that people try to keep themselves in the clear and not admit fault."

13. The trial judge was required to take testimony on two days of this trial in an injunction proceeding so that the recesses were longer than usual. See Moyer v. Brownell, D.C., 137 F.Supp. 594.

and approximately midway during the period that he was on the stand is not subject to the argument that he had been confused by innumerable questions on cross-examination, which his counsel has argued to you affected his testimony.

"Now, this was his testimony at this time when he was first asked about it on cross examination: "

(The court then read from the notes of testimony.)

\* \* \* \* \*

"\* \* \* he did say they were right close to the block, and that was the same impression that Mr. O'Grady had gotten from his view of the engines."

\* \* \* \* \*

"It is quite probable, therefore, that you will find that both Mr. O'Grady and Julius Wells, the plaintiff, were inaccurate in their thought as to the location of the stationery engines. But you *may* find it significant *in determining the reasonableness of Mr. O'Grady's conduct*, that Mr. Wells with a far better view of it than Mr. O'Grady, *testified when first examined on the subject that these engines were right close to the bumper block."* (Italics added.)

Plaintiff argues that this language in the charge is reversible error because (1) it submits fully and prominently the theory of one party and does not call equal attention to the main points of the other party's case, and (2) it contains what plaintiff calls an "argument for defendant" since it points out that if plaintiff misjudged the location of the standing type 400 engine, it may have been reasonable for Mr. O'Grady to misjudge their location also.

■ The trial judge has reviewed carefully the testimony and read and reread the speeches of counsel and the charge which must be considered together. For these reasons, the conclusion has been reached that no reversible error is present in the charge when read as a whole and in relation to the closing speeches:

1. *In including this reference to plaintiff's testimony in the charge, the trial judge was carrying out his duty to see that the jury rendered its verdict on the evidence relevant to the issues.*

The federal courts have held that it is the duty of the trial judge to see that the relevant evidence on the issues to be decided by the jury are submitted to it. See Garrison v. United States, 4 Cir., 1932, 62 F.2d 41; Texarkana Bus Co., Inc., v. Baker, 5 Cir., 1944, 142 F.2d 491, 493, and cases there cited.[14] In the Garrison case, the court said in 62 F.2d at page 42:

"In addition to this, the trial judge should not hesitate to give the jury the benefit of his views as to the facts, leaving to them, however, the final determination of the issue."

It has been repeatedly held that it is not reversible error for a federal trial judge to comment upon, and express his opinion upon, a particular item of testimony so long as the decision as to the weight and effect of the testimony is left to the jury.[15] See Vicks-

---

14. The Third Circuit Court of Appeals has recently emphasized the duty of the District Court to make sure that the jury decides "the real issues on their merits." See Robinson v. Pennsylvania Railroad Co., 3 Cir., 1954, 214 F.2d 798, 800; Straub v. Reading Company, 3 Cir., 1955, 220 F.2d 177, 182.

15. On the first day of the trial, the trial judge pointed out to the jury that they were the sole judges of the accuracy and credibility of the witnesses, that their memory of the witnesses' testimony, and not the judge's, controlled, that the facts were to be decided by them and that they should not draw any inferences from any questions he might ask to try "to straighten the situation out in (his) own mind" (N. T. 68). In the charge, the judge emphasized that the jurors were the judges of the facts, the credibility of, and the accuracy of, the wit-

burg & M. R. R. Co. v. Putnam, 1886, 118 U.S. 545, 553, 7 S.Ct. 1, 30 L.Ed. 257; Graham v. United States, 1913, 231 U.S. 474, 480, 34 S.Ct. 148, 58 L.Ed. 319; Lever Brothers Co. v. Atlas Assurance Co., Ltd., 7 Cir., 1942, 131 F.2d 770, 778–779; Zurich v. Wehr, 3 Cir., 1947, 163 F.2d 791, 793.[16] In the Vicksburg case, the United States Supreme Court stated the rule as follows in 118 U.S. at page 553, 7 S.Ct. at page 2:

> "In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error."

The reference to this testimony, which was not mentioned in the closing speeches of either counsel, became important and necessary in the interests of enabling the jury to arrive at a true and just verdict because the plaintiff's closing speech, in relying on Mr. O'Grady's fault, referred to Mr. O'Grady's saying that he could not be sure the engine was near the bumper so that,

plaintiff argued, he should have been "doubly careful." This was not a case of the court emphasizing the theory of the defendant but was a situation where the trial judge referred to evidence, which had not been mentioned by either party, as "one factor" which the jury "may find * * * significant in determining the reasonableness of Mr. O'Grady's conduct * * *." (see page 9 of this opinion [138 F.Supp. 830]).

The cases [17] cited by counsel for plaintiff for the proposition that the trial judge must comment on evidence of both parties are so different on their facts from this case that they are not relevant authorities in the situation presented by this record. For example, the language constituting reversible error in the charge in the Virginian Ry. Co. case (particularly relied on by plaintiff) contained such sentences as these, see pages 402 and 403 of 166 F.2d:

> " 'You see, as I told you a while ago, if you think that a witness testifies falsely about something, you don't need to believe him on anything, so if you believe that Murdock (the engineer) said he sanded the rail, knowing that he did not sand the rail, then that would be a false statement and you would not have to believe anything he said.
>
> *    *    *    *    *
>
> "Murdock had said at a former trial of this case that in the position in which he was sitting, when

---

nesses, the weight and importance of the evidence (N. T. 421 & 422). At the beginning of that part of the charge dealing with the legal issues, this language was used:

"I am going to instruct you as to the law. However, any comments which I make on the evidence are for you to determine, whether my memory of the evidence is accurate or not, and whether the part of the evidence that I mention is significant or not. That is for you."

At the beginning of the language objected to by plaintiff, the trial judge again emphasized "Again I advise you that it is your memory of the facts which controls * * *." (N. T. 425).

16. In the case of Rucker v. Wheeler, 1888, 127 U.S. 85, 8 S.Ct. 1142, 32 L.Ed. 102, the trial judge, in a contract action, stated to the jury: " 'I do not see that this evidence proves * * * a contract on behalf of defendant to purchase this property through plaintiff.' " The court held this was not reversible error, since the jury was informed in the charge that it was up to them to determine the issues.

17. Pullman Co. v. Hall, 4 Cir., 1931, 46 F.2d 399; Virginian Ry. Co. v. Armentrout, 4 Cir., 1948, 166 F.2d 400, 4 A. L.R.2d 1064; McGlothan v. Pennsylvania R. R. Co., 3 Cir., 1948, 170 F.2d 121.

he testified that he was sitting in the same position that he was when he waved to his daughter so that we know that when he said before it was impossible, sitting in that position, to wave at his daughter, that that wasn't so—I mean to wave at these boys—that wasn't so, because he shows now that it was possible—not only possible, but he had done it just a minute before that.' " [18]

The court commented on such statements in the charge as follows, at page 402 of 166 F.2d:

"In discussing his evidence as to these matters, the trial judge not only made argument in answer thereto but did so in such a way as to disparage his statements and to imply that he was testifying falsely."

There is nothing in the charge now under consideration indicating that the plaintiff testified falsely or disparaging his testimony. The trial judge only referred to an important part of plaintiff's testimony which had not been referred to in the arguments of counsel. It should also be noted that the trial judge did refer to testimony and arguments made by counsel for plaintiff, such as plaintiff's reliance on the mark on the fence, the testimony concerning the duty of engineers to look ahead, and the contents of plaintiff's points for charge.[19]

If it was proper for the court to comment on this testimony at all, it seems clear that it was proper to read from the notes of testimony in the same way that plaintiff's counsel had read from the notes of testimony in his closing speech. In Roback v. Pennsylvania Railroad Co., D.C.E.D.Pa.1949, 81 F. Supp. 841, 843, the trial judge quoted the testimony of one of the medical witnesses in his charge. Defendant argued that mentioning the doctor's testimony was such "emphasis" on his testimony that failure to comment in addition on defendant's medical testimony was unfair to defendant. The court dismissed the motion for a new trial, holding that the action of the trial judge was not reversible error. The refusal to grant a new trial was affirmed on appeal [3 Cir., 1949, 178 F.2d 485], although this point was not mentioned in the opinion of the Circuit Court of Appeals.

Also, plaintiff complains that the trial judge did not point out the plaintiff's later statements on redirect examination that he did not know how far the standing engines were from the bumper block.[20] As pointed out above,[21] coun-

---

18. The examination by the court in that case of defendant's witnesses, as quoted in the footnote on pages 403–404, of 166 F.2d, is far different from anything which is present in this record.

19. The trial judge read points for charge requested by plaintiff covering more than two pages of the notes of testimony (N. T. 433–436).

20. In this connection, it should be noted that the only exceptions to the court's charge on this point were:

"I would like to have an exception to Your Honor's comments on the plaintiff Wells' testimony. I would like an exception to Your Honor reading a portion of the plaintiff Wells' testimony."

Plaintiff's counsel did not request the court to point out to the jury plaintiff's later testimony on redirect examination and he did not ask that the court comment on any other part of the testimony given by plaintiff. Counsel did not state "the grounds" of this objection as required by Fed.Rules Civ.Proc. rule 51, 28 U.S.C.A. See Jack v. Craighead Rice Mill. Co., 8 Cir., 1948, 167 F.2d 96, certiorari denied New Amsterdam Cas. Co. v. Craighead Rice Milling Co., 334 U.S. 829, 68 S.Ct. 1340, 92 L.Ed. 1756; cf. Trowbridge v. Abrasive Co., 3 Cir., 1951, 190 F.2d 825; Campbell v. Krauss, 3 Cir., 1918, 249 F. 670. In Young v. Travelers Ins. Co., 10 Cir., 1933, 68 F.2d 83, at page 85, which is relied on by plaintiff, counsel for the appellant used this language in taking exception to the charge:

" 'I want to except to that portion of the instructions on Graham's testimony that he jumped, *or ask the court to explain it by an instruction on his testimony on cross examination that he was unable to state whether he jumped or not.' "  (Emphasis supplied.)

sel for plaintiff had gone over this later testimony of plaintiff fully in his closing speech. The language of the charge both referred to the argument plaintiff had made on this point in his closing speech (through mentioning the "innumerable questions" on cross examination), thereby recalling it to the jury's attention, and pointed out that plaintiff so testified when "first examined on the subject",[22] thereby implying that his later testimony had been different.

■ **2.** *In any event, the use of the language in the charge alleged to be objectionable is harmless error.*

Even if the language of the charge, pointing out that plaintiff, as well as Mr. O'Grady, believed that the engine was back near the bumper block, was error, it seems clear that it was harmless error[23] in view of the jury's special finding that the defendant was negligent. This language was clearly and expressly related to the question of the negligence of Mr. O'Grady.[24] The italicized language in the charge at page 9 of this opinion 138 F.Supp. 830, makes clear that the discussion of plaintiff's testimony to which objection is made is specifically related only to the issue of defendant's negligence. Also, the issue of damages is discussed in the charge after the issue of negligence and this discussion of damages separates the language alleged to be objectionable from that part of the charge calling the jury's attention to the issue of contributory negligence. To the extent that this testimony was considered by the jury on the issue of contributory negligence,[25] it would seem to the trial judge to have been helpful, rather than adverse, to a finding that plaintiff acted with due care. Counsel for defendant had pointed out to the jury the proposition urged on the court by plaintiff, namely that the plaintiff did not know where this standing engine was. Then counsel for defendant continued his argument, inferring that plaintiff should have known its location, due to the view available to him, if he had stayed at his post at the east end of his engine. The alleged objectionable discussion of plaintiff's testimony emphasized that, to the extent plaintiff could estimate, the standing engine was way back by the bumper block and, further, that this was also the conclusion of the engineer, who was the only other person on plaintiff's engine.

There was no such request as that *underlined above in this record.* The court could not be expected to comment on all the testimony of the plaintiff which covers 100 pages in the record.

21. Paragraph 1 of page 8 of this opinion, 138 F.Supp. 829.

22. See last sentence of quotation from charge on page 9 above [138 F.Supp. 830].

23. See St. Joseph & G. I. Ry. Co. v. Moore, 1917, 243 U.S. 311, 315, 37 S.Ct. 278, 61 L.Ed. 741; Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 259, 42 S.Ct. 475, 66 L.Ed. 927.

24. The charge is divided into these five parts:

A. Introductory remarks concerning functions of jury and Judge. (N. T. 420 to top of page 423)

B. Defendant's negligence and its contribution to the injuries. (1st paragraph on top of N. T. 423 to bottom of 428)

C. Damages. (last paragraph on p. 428 to bottom of 429)

D. Plaintiff's contributory negligence and its proportionate contribution to the injury. (N. T. 430–432).

E. Points for charge and concluding remarks. (N. T. 433–440)

Parts B and C cover special questions 1 and 2; Part D covers special questions 3 and 4, as set out in footnote 1 above. The language to which objection is made was in part B, but the only issue decided against the plaintiff was covered in part D.

25. The part of the charge concerning contributory negligence only referred to the distance of the 400 type engine from the bumper block in this sentence:

"In this connection you may take into consideration his testimony that he believed the stationary engines were 'right close' to the bumper block, his testimony that he was relying on a mark on the fence which he could see before he left his post, and all the other testimony in the case."

There was ample evidence from which the jury could find plaintiff 50% negligent under the terms of the Federal Employers' Liability Act without considering the language alleged to be objectionable and, further, that this negligence contributed to the injury (see, for example, the last sentence of footnote 7).[26]

Order

Now, January 26, 1956, defendant's motion for a new trial is denied.

26. Although plaintiff's brief in support of his motion for new trial did not mention the points, paragraphs 1 and 6 of his motion state that the trial judge erred in charging the jury on contributory negligence and, further, that the trial judge "unduly emphasized" this issue. It is noted that counsel for plaintiff referred to defendant's burden of proving plaintiff's negligence in his closing speech to the jury without mentioning the comparative negligence feature, etc., so that it was essential to clarify this issue to the jury in the charge. Also, the trial judge advised both counsel prior to the closing speeches that he would read defendant's point II, 2, (which is set out at N. T. 450 and covers contributory negligence) to the jury and no objection was made by plaintiff at that time.